**COMMONWEALTH TRUST CO. OF PITTS-
BURGH v. RECONSTRUCTION
FINANCE CORPORATION.**

No. 7541.

Circuit Court of Appeals, Third Circuit.

April 24, 1941.

Eugene B. Strassburger, of Pittsburgh, Pa. (Frank W. Stonecipher, of Pittsburgh, Pa., on the brief), for appellant.

Richardson Dilworth, of Philadelphia, Pa. (Harold E. Kohn and Murdoch, Paxson, Kalish & Green, all of Philadelphia, Pa., on the brief), for appellee.

Before MARIS, JONES, and GOODRICH, Circuit Judges.

JONES, Circuit Judge.

The plaintiff, Commonwealth Trust Company, trustee in bankruptcy of Colonial Iron Company, a Pennsylvania corporation, seeks to recover from the Reconstruction Finance Corporation (hereinafter designated as R. F. C.) certain pig iron, or the value thereof, which had been pledged by the Iron Company, prior to its bankruptcy, as security for the payment of loans from the R. F. C. The court below entered judgment for the defendant from which the plaintiff took the present appeal. It is the appellant's contention that the pledge was void either (1) as having been made by the Iron Company with an intent to hinder, delay or defraud its creditors, or (2) as a fraud upon third persons because of an absence of delivery of the pledge at the time it was made.

A jury trial having been waived, the trial court expressly adopted as its findings (Nos. 1 to 36 inclusive) the facts as stipulated by the parties. Naturally, these findings the appellant does not attack. On the basis of the findings thus made and from oral testimony adduced at trial, the court below made three additional findings to the effect, respectively, that the pledge was not made with the intent, on the part of either the Iron Company or R. F. C., to hinder, delay or defraud any creditor of the Iron Company, present or future (Finding No. 37); that R. F. C. gave the Iron Company "fair consideration" for the pledge in an amount not disproportionately small compared with the value of the pig iron pledged (Finding No. 38); and the Iron Company was solvent when the pledge agreement was entered into (Finding No. 39). The evidence fully supports these findings. No error—not to speak of clear error—appearing

therein, they are to be given full effect upon appeal. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c; Reinstine v. Rosenfield et al., 7 Cir., 111 F.2d 892, 895. The facts material to a consideration of the questions involved may be summarized from the findings as follows:

From 1899 to 1929 Colonial Iron Company operated a blast furnace, coke ovens and coal mines at Riddlesburg, Pennsylvania. For business reasons, the blast furnace was closed down in 1929. It remained closed thereafter until 1937, when it was reopened through the aid of the R. F. C. loans which figure in the present controversy.

With a view to reopening the blast furnace, the Iron Company on January 18, 1935, applied to the First National Bank of Everett, Pennsylvania, for a loan of $110,000, wherein the R. F. C. was to participate as a lender to the extent of $100,000. The Iron Company in its application for the loan certified that it was solvent and had fixed assets of a value of $1,371,000. The loan was intended to enable the Iron Company to make repairs to the blast furnace and to provide working capital for its future operation. The loan was granted and the Iron Company evidenced the indebtedness with its note secured by a first mortgage of its fixed assets. Both the note and the mortgage securing it, which were drawn in favor of the First National Bank of Everett, were duly assigned to the R. F. C. at the time of the first disbursement to the Iron Company on account of the loan, the mortgage having theretofore been recorded.

Subsequently, the Iron Company found that the money already borrowed was insufficient for the intended purposes and applied to the R. F. C. on January 12, 1937, for a further loan of $125,000, of which $10,000 was to be used to complete the repairs to the furnace and the remainder for operating expenses. The security offered by the Iron Company for this loan was a second mortgage of its fixed assets, a pledge of all pig iron produced or to be produced by the Iron Company, the placing of the accounts receivable by the Iron Company from the sale of pig iron in a trust account in favor of R. F. C., and the deposit of $75,000 of the second loan in a separate trust account which was to be subject to check by R. F. C. and the Iron Company jointly. This loan was also

granted and the Iron Company executed and delivered therefor its note to R. F. C. on March 31, 1937. A pledge agreement to effectuate the proferred security for this note was executed on April 6, 1937.

The pledge agreement provided that pig iron as produced by the Iron Company should be placed on nearby land which was leased by the Iron Company to the R. F. C. The leased land was enclosed by a wire fence and plainly marked by signs denoting R. F. C.'s possessory right. The lease was duly recorded and the premises were in the control of a custodian for R. F. C. who had direction over the removal of iron therefrom.

It was also provided by the pledge agreement that the Iron Company could draw upon the $75,000 trust account if pig iron, or accounts receivable from the sale thereof, of a value equal to the withdrawal was delivered to R. F. C. But there was no absolute right in the Iron Company to make withdrawals from the trust account (subject to joint check) and no pig iron deposited on the leased premises, even if the value thereof exceeded $75,000, was to be released except in the discretion of R. F. C.

The Iron Company resumed blast furnace operations on May 24, 1937. By June 23, 1937, the $75,000 trust account had been entirely withdrawn by the Iron Company which, in pursuance of the pledge agreement, had transferred to R. F. C.'s control on the leased premises pig iron of a value in excess of $75,000. On June 28, 1937, the Iron Company made application for a further loan of $75,000 to enable it to buy ore necessary for its operations, which R. F. C. granted. The security given for the note evidencing this loan was the ore purchased, as represented by warehouse receipts, and all other property of the Iron Company on the premises of R. F. C. whether pledged as collateral for this or any other loan. On November 26, 1937, the Iron Company requested the R. F. C. to release 1,400 tons of pig iron which would still have left iron of a value in excess of $75,000 in the R. F. C. yard. The request was refused. At the time, all notes were in default and the balance due the R. F. C. thereon aggregated in excess of $285,000. Thereupon the Iron Company closed its plant, went into receivership and later into bankruptcy. Since then, the R. F. C. has sold some of the pig iron in the yard for $56,522.14 which the appellant concedes represents fair value. The R. F. C. still has on hand in the yard iron of the admittedly fair value of $28,887.96. The trustee claims the proceeds of the iron sold by the R. F. C. and the iron which it still has on hand.

▮ The questions which the appellant raises respecting the pledge in this case are to be determined by the law of Pennsylvania. Taplinger v. Northwestern National Bank in Philadelphia, 3 Cir., 101 F.2d 274, 275. Either under the common law of that state or the Uniform Fraudulent Conveyances Act, there in force,[1] in the absence of an actual intent to defraud, it is essential that the allegedly fraudulent transfer shall have been made "without fair consideration". See Secs. 4, 5 and 6 of the Pennsylvania Fraudulent Conveyances Act, 39 P.S. §§ 354, 355 and 356; also Statute of Elizabeth, ch. 5, Sec. 3, Roberts Digest 295, 39 P.S. following section 363, expressly made part of the common law of Pennsylvania, Report of Judges, 3 Binney, Pa., 595, 621. Where "fair consideration" for the debtor's conveyance is lacking, the intent to hinder, delay or defraud is presumed as a matter of law. It is only where an actual intent to defraud is proven that the transfer is void without regard for the quantum of the consideration. See Sec. 7 of the Pennsylvania Fraudulent Conveyances Act, 39 P.S. § 357. We do not understand the appellant to suggest that this case presents actual intent to defraud. In any event, the trial court justifiably found that no such intent existed; and that finding is conclusive here. It follows, therefore, that if the pledge is to be successfully challenged as constituting a fraud upon creditors, it is incumbent upon the appellant to show that the transfer was made "without fair consideration".

What constitutes "fair consideration" the Uniform Fraudulent Conveyances Act itself defines as follows:

"Fair consideration is given for property or obligation:

"(a) When, in exchange for such property or obligation, as a fair equivalent therefor and in good faith, property is

---

[1] Act of May 21, 1921, P.L. 1045, 39 P.S. §§ 351–363.

conveyed or an antecedent debt is satisfied; or

"(b) When such property or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property or obligation obtained." 39 P.S. § 353.

The court below expressly found that "a fair consideration [was] given by the defendant [R. F. C.] to the Colonial Iron Company for the pledge of pig-iron involved in this case in an amount not disproportionately small, as compared with the value of the pig-iron". This finding, which the evidence fully supports, establishes the fact from which the trial court correctly concluded as a matter of law that the Iron Company's transfer was not made with an intent to hinder, delay or defraud creditors.

Notwithstanding the absence of any intent to defraud, either actual or constructive, it is the appellant's contention that the pledge was so ineffectually created as to amount to a fraud on third persons, citing and relying upon Clow v. Woods, 5 Serg. & R., Pa., 275, 9 Am. Dec. 346. It was there held that delivery of possession of pledged goods or chattels is legally indispensable to the validity of the pledge so far as the rights of third parties are concerned. Such, we believe, is the law of Pennsylvania and that there has been no deviation from the rule stated in Clow v. Woods. It does not follow, however, as the appellant would have us conclude, that because delivery of possession of goods or chattels cannot take place until they are in existence, a pledge of goods to be manufactured in the future cannot be validly made. Nor is Clow v. Woods authority for the proposition. There, the pledged goods were in existence at the time of the debtor's mortgage thereof. None the less, the pledgees permitted them to remain in the possession of the debtor for his own service and processing. No notice of a change of ownership was given in any manner and the mortgage was not recorded. The Clow case was peculiarly concerned with an effort on the part of the debtor and certain creditors to create on personalty a secret lien existing separately from the possession, which is what the ruling in that case refused to countenance. A pledge in such circumstances, while good between the parties, is a fraud as to third persons.

But the fact that the goods, as here, were not in existence when the pledge was made does not preclude a legally sufficient delivery thereof, under the pledge, once they are produced. In Collins' Appeal, 107 Pa. 590, 52 Am.Rep. 479, a pledge of an interest in an unformed partnership was upheld against a general creditor of the pledgor. Speaking for the Pennsylvania Supreme Court in that case, Mr. Justice Green said (107 Pa. at page 603, 52 Am.Rep. 479) that "the existence of the subject of the pledge at the time the contract of pledge is made, is not at all necessary. If it comes into existence afterwards it is affected, in equity, at once by the lien stipulated for." The appellant would distingush the Collins case from the present on the ground that the thing there pledged was a chose and not a chattel. But that is a distinction without a difference so far as the current pledgeability of an interest to accrue or of goods to be produced in the future is concerned. The pledge is no less equitable in the one instance than it is in the other. The thing of importance is whether the goods, when produced, are subjected promptly to the pledgor's possession by notorious delivery.

In determining whether the delivery of the pig iron pledged was legally effective, it is proper to take into consideration "the character of the property, the use to be made of it, the nature and object of the transaction [and] the position of the parties". Shipler et al. v. New Castle Paper Products Corp., 293 Pa. 412, 421, 143 A. 182, 185, Callahan v. Union Trust Co. of Pittsburgh, 315 Pa. 274, 277, 172 A. 684; Barnett v. Cain, 88 Pa.Super. 106, 108. The particular circumstances are therefore important. In Barnett v. Cain, supra, it was said (88 Pa.Super. at page 108) that what "would be a sufficient delivery of possession and retention of it in one case might not be in another;" and that "the law does not set up an unbending test of the sufficiency of delivery and retention of possession to be applied in all cases, * * *". Among the indicia of the change of possession in the instant case was the "change of ownership of the land" (a lease) whereon the pig iron was stored immediately upon its manufacture (Summit Hosiery Co. v. Gottschall, 292 Pa. 464, 469, 141 A. 298, 299), and the segregation and marking of the property. Sholes et al. v. Western Asphalt Block & Tile Co., 183 Pa. 528, 530, 38 A. 1029. In addition to these open and no-

torious acts of delivery of possession of the pig iron under the pledge agreement, the lease, which expressly referred to the pledge agreement and clearly indicated its own purpose to effectuate the pledge, had been promptly recorded upon its execution, which was six weeks before the Iron Company began to operate the blast furnace for the manufacture of pig iron. In such circumstances, the learned trial court did not err in concluding that the delivery of the pig iron was legally sufficient to create a valid pledge thereof under the law of Pennsylvania. With the validity of the pledge determined, it is unnecessary to discuss the appellant's remaining contentions both of which assume its invalidity.

The judgment of the District Court is affirmed.